CITY OF WESTLAND POLICE &
FIRE RETIREMENT SYSTEM,
Plaintiff Below, Appellant,

v.

AXCELIS TECHNOLOGIES, INC.,
Defendant Below, Appellee.

No. 594, 2009.

Supreme Court of Delaware.

Submitted: May 12, 2010.
Decided: Aug. 11, 2010.
Corrected: Aug. 13, 2010.

Jay W. Eisenhofer, Michael J. Barry (argued) and Christian J. Keeney, Esquires, of Grant & Eisenhofer P.A., Wilmington, Delaware; for Appellant.

John L. Reed (argued), Paul D. Brown, K. Tyler O'Connell and Aleine M. Porterfield, Esquires, of Edwards Angell Palmer & Dodge LLP, Wilmington, Delaware, for Appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

JACOBS, Justice:

Westland Police & Fire Retirement System ("Westland"), the plaintiff below-appellant, brought this action under Section 220 of the Delaware General Corporation Law to review books and records of the defendant below-appellee, Axcelis Technologies, Inc. ("Axcelis" or "the Company").[1] The Court of Chancery held that Westland had not met its evidentiary burden to demonstrate a "proper purpose" for inspecting Axcelis' records. On appeal, Westland claims that the Court of Chancery improperly applied the well-established standard that requires a stockholder seeking inspection under 8 *Del. C.* § 220 to present some evidence suggesting a credible basis from which a court can infer that mismanagement or wrongdoing may have occurred. We find no error, and affirm the Court of Chancery's dismissal of the action.

## FACTUAL AND PROCEDURAL BACKGROUND [2]

### A. The Parties

Axcelis is a Delaware corporation specializing in the manufacture of ion implantation and semiconductor equipment. Axcelis' stock is publicly traded on the

---

1. 8 *Del. C.* § 220 pertinently provides:
 Any stockholder ... shall, upon written demand under oath stating the purpose thereof, have the right during the usual hours for business to inspect for any proper purpose, and to make copies and extracts from:
 (1) The corporation's stock ledger, a list of its stockholders, and its other books and records; and (2) A subsidiary's books and records, to the extent that:
 a. The corporation has actual possession and control of such records of such subsidiary; or

b. The corporation could obtain such records through the exercise of control over such subsidiary....
 If the corporation ... refuses to permit an inspection sought by a stockholder ... the stockholder may apply to the Court of Chancery for an order to compel such inspection.

2. The facts are summarized from the parties' Joint Stipulation of Uncontested Facts and the exhibits thereto.

NASDAQ. Westland is a Michigan pension fund, that beneficially owns Axcelis common stock.

In 1983, Axcelis and Sumitomo Heavy Industries, Ltd. ("SHI"), a Japanese company, established, as equal partners, a joint venture called "SEN." That joint venture develops, manufactures and sells semiconductor equipment and licenses technology from Axcelis.

At all relevant times, Axcelis' board of directors (the "Board") consisted of seven members. Chairwoman Mary G. Puma was Axcelis' President and CEO. The remaining six directors—Stephen R. Hardis, Patrick H. Nettles, H. Brian Thompson, William C. Jennings, R. John Fletcher, and Geoffrey Wild—were outside, non-employee directors and were "Independent Directors" under the NASDAQ listing standards.

*B. SHI's Acquisition Proposals*

On February 4, 2008, SHI (together with TPG Capital LLP) made an unsolicited bid to acquire Axcelis for $5.20 per share. That day, Axcelis shares closed at a price of $4.18 per share. On February 7, Axcelis informed SHI that it would respond to its acquisition proposal after consulting with Axcelis' advisors. On February 25, 2008, the Board issued a press release announcing its rejection of SHI's proposal. The Board determined that the $5.20 per share offered price materially discounted Axcelis' true worth, because it did not assign any value for Axcelis' opportunity to retrieve market share from its competitors, or for the synergistic value of Axcelis' 50% interest in SEN.

On March 10, 2008, SHI made a second bid to acquire Axcelis, this time for $6 per share. That day, Axcelis shares closed at a price of $5.45 per share. On March 17, the Board rejected SHI's second proposal, stating that "the proposal undervalues Axcelis and is not in the best interests of Axcelis and its shareholders." The Board expressed its willingness to meet with SHI privately, however, to explore whether the parties could reach an agreement on a transaction involving SEN.

*C. The May 2008 Axcelis Shareholder Meeting*

On May 1, 2008, Axcelis held its annual shareholders' meeting. Axcelis had a classified board and the three directors standing for reelection—Messrs. Hardis, Fletcher and Thompson—were unopposed. Axcelis follows the plurality voting provisions of Delaware statutory law, under which a director may be elected without receiving a majority of the votes cast.[3] Importantly, however, the Axcelis Board also had adopted a "plurality plus" governance policy, which provides that:

> At any shareholder meeting at which Directors are subject to an uncontested election, any nominee for Director who receives a greater number of votes "withheld" from his or her election than votes "for" such election shall submit to the Board a letter of resignation for consideration by the Nominating and Governance Committee. The Nominating and Governance Committee shall recommend to the Board the action to be taken with respect to such offer of resignation. The Board shall act promptly with respect to each such letter of resignation and shall promptly

3. 8 *Del. C.* § 216(3) provides that absent a specification to the contrary in the certificate of incorporation or by-laws of a corporation, "[d]irectors shall be elected by a plurality of the votes of the shares present in person or represented by proxy at the meeting and entitled to vote on the election of directors."

notify the Director concerned of its decision.[4]

All three directors seeking reelection at the 2008 annual meeting received less than a majority of the votes cast, which triggered the "plurality plus" governance policy. Therefore, in accordance with that policy, the three directors tendered letters of resignation. The Board, however, decided not to accept the resignations, and in a May 23, 2008 press release, explained why:

> [T]the board considered a number of factors relevant to the best interests of Axcelis. The Board noted that the three directors are experienced and knowledgeable about [the Company], and that if their resignations were accepted, the Board would be left with only four remaining directors. One or more of the three directors serves on each of the key committees of the Company and Mr. Hardis serves as a lead director. The Board believed that losing this experience and knowledge would harm the Company. The Board also noted that retention of these directors is particularly important if Axcelis is able to move forward on discussions with SHI following finalization of an appropriate nondisclosure agreement.

> The Board also expressed its intention to be responsive to the shareholder concerns that gave rise to the withhold votes. The Board is seeking to engage in confidential discussions with SHI and, prior to next year's Annual Meeting, the Board will consider recommending in favor of a declassification proposal at that meeting.

## D. Axcelis and SHI Renew Their Negotiations

On June 6, 2008, Axcelis and SHI (together with TPG Capital LLP) entered into a confidentiality agreement to facilitate discussions concerning a possible acquisition of Axcelis. Axcelis management then furnished due diligence information to SHI, and met with SHI representatives to discuss SHI's due diligence requests. Axcelis and SHI agreed that SHI would submit a revised acquisition proposal by August 1, 2008.

Shortly thereafter, however, SHI attempted to change that agreement. SHI requested a seven week extension to perform due diligence, after which it would decide whether or not to submit a revised acquisition proposal. SHI also indicated that if it made a proposal, it would need an additional five week period to conduct confirmatory due diligence. Axcelis did not agree to SHI's requested extension, and informed SHI that it would have until the end of August 2008 to submit a revised acquisition bid. Axcelis also proposed that any SEN–Axcelis combination should involve SHI exchanging its SEN shares for shares of Axcelis.

SHI never submitted a revised acquisition bid. Instead, on September 4, 2008, SHI informed Axcelis that it was putting all discussions regarding an acquisition "on hold." By September 15, 2008, after Axcelis publicly announced that development, Axcelis stock had dropped to $1.43 per share.

## E. Westland Demands Axcelis' Books and Records

On December 9, 2008, Westland sent a demand letter to Axcelis under 8 *Del. C.*

---

**4.** This type of governance policy is sometimes referred to as a "Pfizer-style" policy (because Pfizer, Inc. pioneered its use) or a "plurality plus" policy. *See City of Westland Police & Fire Retirement Sys. v. Axcelis Tech., Inc.,* 2009 WL 3086537, at *2 n. 11 (Del.Ch. Sep. 28, 2009). The Axcelis "plurality plus" policy was adopted by Board resolution, as distinguished from being adopted as a by-law or as part of the certificate of incorporation.

§ 220, requesting seven categories of books and records of Axcelis and its subsidiaries.[5] The purpose of that demand, according to Westland, was to investigate:

(a) the Board members' compliance with their fiduciary duties to the Company and its shareholders as it relates to the Board's management of SHI's acquisition proposals; [and]

(b) the Board members' compliance with their fiduciary duties to the Company and its shareholders as it relates to the Board's refusal to accept the resignations of Directors Stephen R. Hardis, R. John Fletcher, and H. Brian Thompson.

By letter dated December 12, 2008, Axcelis rejected Westland's demand, on the ground that it did "not satisfy the standard set forth in Section 220 and Delaware's jurisprudence interpreting Section 220."

### F. Axcelis Sells Its Stake in SEN to SHI

On January 15, 2009, Axcelis announced that it had failed to make a required pay-ment of outstanding notes that were governed by a preexisting indenture agreement with U.S. Bank National Association. On February 26, 2009, the Board announced that it had agreed to sell Axcelis' stake in SEN to SHI for approximately $132.6 million. That sale closed on March 30, 2009, by which point Axcelis shares were trading at $0.41 per share. The proceeds from that sale were used to pay off the notes that had matured and fallen due two months earlier.

### G. Westland Seeks to Compel Inspection of Axcelis' Books and Records

On April 2, 2009, Westland filed a complaint in the Court of Chancery seeking a court-ordered inspection of Axcelis' books and records under 8 Del. C. § 220(c). Westland was required, under Section 220(c), to establish that it was seeking inspection for a "proper purpose."[6] Westland claimed that it had stated a proper purpose for its demand—namely, to investigate possible management wrongdoing.[7]

---

5. The books and records requested by Westland were as follows:

1. All minutes of agendas for meetings (including all draft minutes and agendas and exhibits to such minutes and agendas) of the Board at which the Board discussed, considered or was presented with information concerning SHI's acquisition proposals.

2. All documents reviewed, considered or produced by the Board in connection with SHI's acquisition proposals.

3. Any and all communications between and among Axcelis directors and/or officers and SHI directors and/or officers.

4. Any and all materials provided by SHI to the Board in connection with SHI's acquisition proposals.

5. Any and all valuation materials used to determine the Company's value in connection with SHI's acquisition proposal.

6. All minutes of agendas for meetings (including all draft minutes and exhibits to such minutes and agendas) of the Board at which the Board discussed, considered or was presented with information concerning or related to the Board's decision not to accept the resignations of Directors Stephen R. Hardis, R. John Fletcher, and H. Brian Thompson.

7. All documents reviewed, considered, or produced by the Board in connection with the Board's decision not to accept the resignations of Directors Stephen R. Hardis, R. John Fletcher, and H. Brian Thompson.

6. 8 Del. C. § 220(c) ("Where the stockholder seeks to inspect the corporation's books and records, other than its stock ledger or list of stockholders, such stockholder shall first establish that ... [t]he inspection such stockholder seeks is for a proper purpose.").

7. See Seinfeld v. Verizon Commc'ns, Inc., 909 A.2d 117, 121 (Del.2006) ("It is well established that a stockholder's desire to investigate wrongdoing or mismanagement is 'proper purpose.' ").

Specifically, Westland claimed that the Axcelis Board's rejection of both SHI's acquisition proposals and the directors' resignations tendered as a result of the May 2008 election, established a credible basis from which the court could infer that wrongdoing may have occurred.[8]

Westland alleged in its complaint that the Board's rejection of the three directors' tendered resignations established a credible basis to infer that the Board intended to entrench those three directors (and indeed the entire Board) in office. Westland predicated its argument on *Blasius Indus. v. Atlas Corp.*,[9] which holds that where a corporate board acts "for the primary purpose of impeding the exercise of stockholder voting power ... the board bears the heavy burden of demonstrating a compelling justification for such action."[10] Here (Westland argued), the Axcelis Board's decision to reject the tendered director resignations frustrated the shareholder vote, the intent and effect of which was to trigger and implement Axcelis' "plurality plus" governance policy. Westland claimed that that Board decision was sufficient, without more, to establish a credible inference of wrongdoing, rebuttable only if the Axcelis Board could prove a "compelling justification." Westland further alleged that the Board's rejections of SHI's acquisition proposals were defensive measures that created a credible suspicion of wrongdoing (*i.e.*, board entrenchment)

under *Unocal Corp. v. Mesa Petroleum Co.*[11]

After a one day trial, based on a stipulation of uncontested facts, the Court of Chancery dismissed Westland's Section 220 action, holding that Westland had failed to demonstrate a "proper purpose" for its demand for inspection. Specifically, the Vice Chancellor found that Westland had failed to present any evidence that the Board's refusal to accept the three directors' resignations thwarted the will of the shareholders or impeded their voting franchise. Rather, all the Board did was exercise the discretion conferred by the Axcelis "plurality plus" governance policy. The Vice Chancellor also found no credible basis from which to infer any possible wrongdoing from the Board's rejection of SHI's two acquisition proposals, because "[r]ejecting an acquisition offer, without more, is not [a] 'defensive action' under *Unocal.*"[12]

This appeal followed.

## ANALYSIS

### A. Westland's Claims on Appeal

Westland claims that the Court of Chancery erred as a matter of law by misapplying the applicable legal standard. Westland concedes that the Court of Chancery opinion invokes the proper standard— namely, that a plaintiff seeking inspection

**8.** *Id.* at 118 ("stockholders seeking inspection under section 220 must present 'some evidence' to suggest a 'credible basis' from which a court can infer that mismanagement, waste or wrongdoing may have occurred.").

**9.** *Blasius Indus. v. Atlas Corp.*, 564 A.2d 651 (Del.Ch.1988).

**10.** *Id.* at 661.

**11.** *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del.1985) (holding that where a corporation's board of directors employs de-

fensive measures against a takeover, the protections of the business judgment rule are conferred upon the board's decision to employ those measures only after a threshold judicial determination that the directors had reasonable grounds for believing that a threat to corporate policy and effectiveness existed, and that the defensive measures were a proportionate response to that threat).

**12.** *Gantler v. Stephens*, 965 A.2d 695, 705 n. 23 (Del.2009).

of books and records must present some evidence, "through documents, logic, testimony or otherwise,"[13] to suggest a credible basis from which the Court of Chancery could infer that wrongdoing may have occurred.[14] Westland claims, however, that the Court misapplied that standard by requiring Westland to provide affirmative evidence of wrongdoing. Westland urges that the undisputed facts are sufficient to discharge its burden because those facts, standing alone, established a credible basis to infer wrongdoing. Additionally, Westland urges this Court to adopt the *Blasius* standard in reviewing the Board's decision to reject the three directors' tendered resignations.

### B. Standard of Review

 This Court reviews *de novo* whether or not a party's stated purpose for seeking inspection under 8 *Del. C.* § 220(b) (here, to investigate possible mismanagement) is a "proper purpose."[15] A trial judge's determination that a credible basis does (or does not) exist to infer managerial wrongdoing is a mixed finding of fact and law that is entitled to considerable deference.[16]

 The standard applicable to a Section 220(b) demand is well established. A stockholder seeking to inspect the books and records of a corporation must demonstrate a "proper purpose" for the inspection. A "proper purpose" is one that is "reasonably related to such person's interest as a stockholder."[17]

 Our law recognizes investigating possible wrongdoing or mismanagement as a "proper purpose." · To obtain Section 220 relief based on that purpose, the plaintiff-stockholder must present "some evidence" to suggest a "credible basis" from which a court could infer possible mismanagement that would warrant further investigation.[18] In *Seinfeld v. Verizon Comm'n, Inc.,*[19] this Court reaffirmed the "credible basis" standard as striking the appropriate balance between (on the one hand) affording shareholders access to corporate records that may provide some evidence of possible wrongdoing and (on the other) safeguarding the corporation's right to deny requests for inspection based solely upon suspicion or curiosity.[20] Thus, a "mere statement of a purpose to investigate possible general mismanagement, *without more*, will not entitle a shareholder to broad § 220 inspection relief."[21]

 A plaintiff may establish a credible basis to infer wrongdoing "through documents, logic, testimony or otherwise."[22] Such evidence need not prove that wrongdoing, in fact, occurred.[23] Because the "credible basis" standard "sets the lowest possible burden of proof,"[24] any reduction of that burden would be tantamount to permitting inspection based on the plain-

---

13. *Sec. First Corp. v. U.S. Die Casting & Dev. Co.,* 687 A.2d 563, 568 (Del.1997).

14. *Seinfeld,* 909 A.2d at 118.

15. *Sec. First Corp.,* 687 A.2d at 567.

16. *Id.* at 565.

17. 8 *Del. C.* § 220(b).

18. *Seinfeld,* 909 A.2d. at 118, 122.

19. 909 A.2d 117 (Del.2006).

20. *Id.* at 118.

21. *Id.* at 122 (emphasis added; citations omitted).

22. *Sec. First Corp.,* 687 A.2d at 568.

23. *Id.* at 567.

24. *Seinfeld,* 909 A.2d at 123.

tiff-stockholder's mere suspicion of wrong-doing.[25]

### C. Westland Failed to Establish a Credible Basis to Infer Wrongdoing

■ Westland's books and records demand identified two allegedly "suspect" incidents of "wrongdoing." The first was Axcelis' Board's handling of SHI's two acquisition proposals. The second was the Board's refusal to accept the resignations of the three directors who failed to receive an affirmative majority vote at the May 2008 annual meeting. Westland's evidence to support its purpose consisted of (1) the parties' Joint Stipulation of Uncontested Facts and exhibits thereto, and (2) Westland's "logical conclusions" from those facts and exhibits that the Axcelis Board had acted out of improper entrenchment motives. The Vice Chancellor, however, drew different "logical conclusions" from those same uncontested facts, and determined that there was "no support in the record of any entrenchment motive" other than Westland's "bare accusations" suggesting such a motive.[26]

Westland claims that the Court of Chancery incorrectly applied the "credible basis" standard by requiring Westland to present "affirmative evidence" of wrongdoing. For support, Westland offers only its proposed interpretation of the uncontested facts, which (Westland asserts) create a "legitimate basis to believe" that the Board's decisions *might* have been the product of improper entrenchment motives. By way of example, Westland conclusorily asserts that "[i]t cannot seriously be disputed . . . that SHI's acquisition proposals could have been deemed a 'threat' to the Axcelis Board's control over the Company," and that the Board's rejection of the three directors' resignations and denial of SHI's request for a "modest" extension, were made "[i]n the face of this threat." Essentially, Westland disagrees with the Vice Chancellor's inferences from the undisputed facts. Westland's disagreement, without any further affirmative showing, is insufficient. The Vice Chancellor concluded that Axcelis' rejection of SHI's unsolicited acquisition proposals, without more, was not a "defensive action" under *Unocal*.[27] That conclusion must stand, because the record provides no credible basis to infer that the Board's rejections of those proposals, and its refusal to extend the deadline for SHI to submit a revised acquisition bid, were other than good faith business decisions.

### D. Proper Purpose to Investigate Suitability of Directors

■ Westland's second claim on appeal is that this Court should adopt the *Blasius* standard when reviewing a board of directors' decision to reject director resignations in cases where a "plurality plus" governance policy (or by-law) is triggered and requires that resignations be tendered. Under *Blasius*, a corporation's board must demonstrate a "compelling justification" for board-adopted measures that interfere with, or frustrate, a shareholder vote.[28] Westland claims that by withholding their votes in the May 2008 director elections—thereby triggering Axcelis' "plurality plus" governance policy—a majority of Axcelis shareholders expressed their will that the three directors should be removed. Because the Board's non-acceptance of the three directors' resigna-

---

**25.** *Id.*

**26.** *City of Westland Police & Fire Retirement Sys. v. Axcelis Tech., Inc.*, 2009 WL 3086537, at *5.

**27.** *Gantler v. Stephens*, 965 A.2d at 705 n. 23.

**28.** *Blasius*, 564 A.2d at 661.

tions frustrated that shareholder will and vote (Westland urges), the Axcelis Board must be required to show a "compelling justification" for its decision.

The Court of Chancery rejected Westland's *Blasius* argument. We have concluded that Westland's *Blasius* argument lacks merit, because it improperly attempts to shift to Axcelis Westland's burden to establish a "proper purpose" for a Section 220 inspection. Accordingly, we agree with the Court of Chancery's decision not to adopt the *Blasius* standard when reviewing a board of directors' discretionary decision to reject director resignations in cases where a "plurality plus" governance policy is triggered and requires that resignations be tendered.

Although we conclude that the Court of Chancery properly rejected Westland's *Blasius* argument, the fact that this dispute arises in connection with a shareholder vote requires a further elaboration of the "proper purpose" requirement of our Section 220 jurisprudence in that context.

At common law a stockholder of a Delaware corporation had a qualified right to inspect or examine the books and records of the corporation. The shareholder had to show that the requested inspection was for a "proper purpose," which at common law was a purpose relating to the interest the shareholder sought to protect by seeking inspection.[29]

The shareholder's right of inspection is currently codified in Title 8, Section 220 of the Delaware Code. With fidelity to its common law origins, Section 220(b) defines "proper purpose" as "a purpose reasonably related to such person's interest as a stockholder." Over time, that concept has expanded as Delaware courts have interpreted the statutory term "proper purpose" to reconcile legitimate interests of shareholders with the ever-changing dynamics and technology of corporate governance. A leading treatise on Delaware law has compiled a non-exclusive list of judicially recognized proper purposes under Section 220.[30] One of those purposes is "to determine an individual's suitability to

**29.** *Rainbow Nav. Inc. v. Pan Ocean Nav.*, 535 A.2d 1357, 1359 (Del.1987).

**30.** Edward P. Welch, Andrew J. Turezyn, and Robert S. Saunders, *Folk on the Delaware General Corporation Law, Fundamentals,* § 220.6.3 (Wolters Kluwer Law & Business, 2009 ed.). The authors summarize the law thusly:

> A stockholder states a "proper purpose" when he seeks to investigate allegedly improper transactions or mismanagement; to clarify an unexplained discrepancy in the corporation's financial statements regarding assets; to investigate the possibility of an improper transfer of assets out of the corporation; to ascertain the value of his stock; to aid litigation he has instituted and to contact other stockholders regarding litigation and invite their association with him in the case; "[t]o inform fellow shareholders of one's view concerning the wisdom or fairness, from the point of view of the shareholders, of a proposed recapitalization

> and to encourage fellow shareholders to seek appraisal"; "to discuss corporate finances and management's inadequacies, and then, depending on the responses, determine stockholder sentiment for either a change in management or a sale pursuant to a tender offer"; to inquire into the independence, good faith, and due care of a special committee formed to consider a demand to institute derivative litigation; to communicate with other stockholders regarding a tender offer; to communicate with other shareholders in order to effectuate changes in management policies; to investigate the stockholder's possible entitlement to oversubscription privileges in connection with a rights offering; *to determine an individual's suitability to serve as a director;* to obtain names and addresses of stockholders for a contemplated proxy solicitation; or to obtain particularized facts needed to adequately allege demand futility after the corporation had admitted engaging in backdating stock options.
>
> (emphasis added; internal citations omitted).

serve as a director," which the Court of Chancery recognized in *Pershing Square, L.P. v. Ceridian Corp.*[31] There, the Court of Chancery stated:

It is difficult for me to understand how determining an individual's suitability to serve as a corporate director is not reasonably related to a person's interest as a stockholder. After all, stockholders elect directors to represent their interests in the corporation and have few other avenues by which they may influence the governance of their companies. Once elected, stockholders may express dissatisfaction only through the electoral check.[32]

The Chancellor recognized, however, that merely stating that purpose does not automatically entitle a shareholder to Section 220 inspection relief:

Inspection under § 220 is not automatic upon a statement of a proper purpose. First, a defendant may defeat demand by proving that while stating a proper purpose, plaintiff's true or primary purpose is improper. Second, a plaintiff who states a proper purpose must also present some evidence to establish a credible basis from which the Court of Chancery could infer there are legitimate concerns regarding a director's suitability. That is, a stockholder must establish a credible basis to infer that a director is unsuitable, thereby warranting further investigation. Third, a plaintiff must also prove that the infor-

mation it seeks is necessary and essential to assessing whether a director is unsuitable to stand for reelection. Finally, access to board documents may be further limited by the need to protect confidential board communications. Thus, accepting that a desire to investigate the "suitability of a director" is a proper purpose does not necessarily expose corporations to greater risk of abuse.[33]

We agree that the purpose articulated in *Pershing Square* is a "proper purpose" for seeking inspection of corporate books and records under Section 220. Although that does not change the outcome of this case— because Westland did not rely on that purpose as a basis for seeking relief— nonetheless the relationship between the shareholder inspection right and the "plurality plus" policy adopted by the Axcelis board merits sharper focus for future guidance.

In this case, the Axcelis "plurality plus" policy was adopted unilaterally as a resolution of the Board, rather than as a by-law or as part of the certificate of incorporation, both of which would require shareholder approval.[34] Here, the Axcelis Board unilaterally conferred upon the shareholders the right to elect directors by majority vote. But, the Board also conditioned that right upon the board's discretionary power to accept (or reject) the resignations of those directors who were

---

31. 923 A.2d 810, 818 (Del.Ch.2007).

32. *Id.* at 817–18.

33. *Id.* at 818.

34. In 2006, Sections 141(b) and 216 of the Delaware General Corporation Law (DGCL) were amended to provide that the board of directors may not repeal a stockholder-adopted by-law that provides for majority voting or some other non-plurality standard.

The DGCL was also amended to permit a director's resignation to be irrevocable when the director was acting in conformity with a policy requiring the director to tender her resignation in the event she does not secure a majority of votes cast in an uncontested election. An Act to Amend Title 8 of the Delaware Code Relating to the General Corporation Law, Public Act No. 306, §§ 3, 5 (June 27, 2006), 2006 Del. ALS 306 (LexisNexis).

elected by a plurality, but not a majority, shareholder vote.

There is a relationship between the shareholders' inspection right and a unilaterally adopted "plurality plus" policy whereby the directors confer upon themselves the discretion to reject resignations tendered by candidates who fail to receive a majority vote. The less-than-majority shareholder vote may be viewed as a judgment by the holders of a voting majority that those director-candidates were no longer suitable to serve (or continue to serve) as directors. Correspondingly, the Board's decision not to accept those resignations may be viewed as a contrary, overriding judgment by the Board. At stake, therefore, is the integrity of the Board decision overriding the determination by a shareholder majority. Stated differently, the question arises whether the directors, as fiduciaries, made a disinterested, informed business judgment that the best interests of the corporation require the continued service of these directors, or whether the Board had some different, ulterior motivation.

Where, as here, the board confers upon itself the power to override an exercised shareholder voting right without prior shareholder approval (as would be required in the case of a shareholder-adopted by-law or a charter provision), the board should be accountable for its exercise of that unilaterally conferred power. In this specific context, that accountability should take the form of being subject to a shareholder's Section 220 right to seek inspection of any documents and other records upon which the board relied in deciding not to accept the tendered resignations.

That is not to say that the making of a Section 220 demand, or the filing of a

Section 220 action, for the purpose of investigating the suitability of directors whose tendered resignations were rejected, will automatically entitle the plaintiff shareholder to relief. It is to say that a showing that enough stockholders withheld their votes to trigger a corporation's (board-adopted) "plurality plus" policy satisfies the *Pershing Square* requirement that "a stockholder must establish a credible basis to infer that a director is unsuitable, thereby warranting further investigation."[35] Nevertheless, to be entitled to relief, the plaintiff must still make the additional showing articulated by the Chancellor in *Pershing Square*. That, in our view, strikes the appropriate balance between the shareholders' entitlement to information and the directors' entitlement to make decisions in the corporation's best interest free from abusive litigation.

## CONCLUSION

For the reasons set forth, the judgment of the Court of Chancery is affirmed.

---

**35.** *Pershing Square,* 923 A.2d at 817–18.