IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| AMERISOURCEBERGEN CORPORATION, | § § § | No. 60, 2020 |
| Defendant Below, Appellant, | § § § § | Court Below: Court of Chancery of the State of Delaware |
| v. | § § § | C.A. No. 2019-0527-JTL |
| LEBANON COUNTY EMPLOYEES' RETIREMENT FUND and TEAMSTERS LOCAL 443 HEALTH SERVICES & INSURANCE PLAN, | § § § § § | |
| Plaintiffs Below, Appellees. | § § | |

Submitted: September 23, 2020
Decided: December 10, 2020

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en Banc*.

Upon appeal from the Court of Chancery. **AFFIRMED**.

Stephen C. Norman, Esq., Jennifer C. Wasson, Esq., Tyler J. Leavengood, Esq., POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Michael D. Blanchard, Esq. (*argued*), Amelia G. Pennington, Esq., MORGAN, LEWIS & BOCKIUS LLP, Boston, Massachusetts, *for Appellant AmerisourceBergen Corporation*.

Samuel L. Closic, Esq., (*argued*) Eric J. Juray, Esq., PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Gregory V. Varallo, Esq., BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP, Wilmington, Delaware, *for Appellees Lebanon County Employees' Retirement Fund* and *Teamsters Local 443 Health Services and Insurance Plan*.

Eric L. Zagar, Esq., Michael C. Wagner, Esq., Christopher M. Windover, Esq., KESSLER TOPAZ MELTZER & CHECK, LLP, Radnor, Pennsylvania, *for Appellee Lebanon County Employees' Retirement Fund*.

Frank R. Schirripa, Esq., Daniel B. Rehns, Esq., Hillary Nappi, Esq., HACH ROSE SCHIRRIPA & CHEVERIE LLP, New York, New York; David Wales, Esq., Andrew Blumberg, Esq., BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York, *for Appellee Teamsters Local 443 Health Services* and *Insurance Plan*.

**TRAYNOR**, Justice:

This is an interlocutory appeal from a Court of Chancery memorandum opinion[1] in an action brought under Section 220 of the Delaware General Corporation Law (the "DGCL") ordering AmerisourceBergen Corporation (the "Company" or "AmerisourceBergen") to produce certain books and records to Lebanon County Employees Retirement Fund and Teamsters Local 443 Health Services & Insurance Plan (the "Plaintiffs") and granting the Plaintiffs leave to take a Rule 30(b)(6) deposition "to explore what types of books and records exist and who has them."[2] The Company claims that the Plaintiffs' inspection demand, which, among other things, was aimed at investigating possible breaches of fiduciary duty, mismanagement, and other wrongdoing, was fatally deficient because it did not disclose the Plaintiffs' ultimate objective—that is, what they intended to do with the books and records in the event that they confirmed their suspicion of wrongdoing. The Company also contends that the Court of Chancery erred by holding that the Plaintiffs were not required to establish a credible basis to suspect *actionable* wrongdoing. And finally, the Company argues that the Court of Chancery erred as a matter of law when it allowed the Plaintiffs to take a post-trial Rule 30(b)(6) deposition.

---

[1] *Lebanon Cnty. Emps.' Ret. Fund v. AmerisourceBergen Corp.*, 2020 WL 132752 (Del. Ch. Jan. 13, 2020).
[2] *Id.* at *29.

In this opinion, we hold that, when a Section 220 inspection demand states a proper investigatory purpose, it need not identify the particular course of action the stockholder will take if the books and records confirm the stockholder's suspicion of wrongdoing. We also hold that, although the actionability of wrongdoing can be a relevant factor for the Court of Chancery to consider when assessing the legitimacy of a stockholder's stated purpose, an investigating stockholder is not required in all cases to establish that the wrongdoing under investigation is actionable. And lastly, we find that the Court of Chancery's allowance of the post-trial deposition was not an abuse of discretion. Our reasons follow.

## I.     BACKGROUND

During the ongoing opioid epidemic, AmerisourceBergen, one of the country's largest opioid distributors, has been investigated by numerous law-enforcement and government agencies. The Court of Chancery discussed these investigations in depth; we briefly summarize them here.

### A.     Factual Background[3]

Federal regulations require opioid distributors to maintain effective controls and reporting systems to ensure that drug shipments stay within "legitimate medical, scientific, and industrial channels."[4]  In 2007, the federal Drug Enforcement

---

[3] We take the essential facts from the Court of Chancery's opinion below. *Id.* at *1–6.
[4] *Id.* at *2 (quoting 21 U.S.C. § 823(e)(1)).

Administration (the "DEA") suspended AmerisourceBergen's license at its Orlando, Florida distribution center, concluding that AmerisourceBergen had not maintained effective controls there in part because it failed to flag rogue pharmacies that:

> (i) ordered opioids from AmerisourceBergen in amounts that far exceeded what an average pharmacy orders, (ii) ordered small amounts of other drug products relative to the pharmacies' [opioids] purchases, (iii) ordered [opioids] much more frequently than [AmerisourceBergen]'s other pharmacy customers, and (iv) were publicly known to fill[] prescriptions that were issued by physicians acting outside the usual course of professional practice . . . .[5]

AmerisourceBergen settled with the DEA and agreed to implement and maintain at all its facilities a "compliance program designed to detect and prevent diversion of controlled substances."[6] Following the settlement, AmerisourceBergen continued to work with the DEA to implement an anti-diversion program and to develop an industry standard for opioid-distribution compliance.

Despite these efforts, since 2012 AmerisourceBergen has been the subject of several governmental reports, investigations, and state and federal lawsuits. Federal prosecutors in ten states and the attorneys general of forty-one states have either subpoenaed the company's documents or named it as a defendant in litigation. Two congressional investigations found that AmerisourceBergen failed to address suspicious order monitoring in violation of federal law. The first investigation,

---

[5] *Id.* (alterations in original) (internal quotations and citations omitted).
[6] *Id.*

initiated by the Energy and Commerce Committee of the United States House of Representatives, focused specifically on AmerisourceBergen's operations in West Virginia. The report, released in 2018 after the investigation (the "West Virginia Report"), found that AmerisourceBergen had improved its monitoring and evaluation of suspicious orders in West Virginia following the 2007 settlement with the DEA, but that the Company had failed to maintain that progress. The West Virginia Report compared the number of opioid doses shipped by the Company with the number of suspicious orders reported, revealing that "AmerisourceBergen's reporting of suspicious orders declined significantly, eventually reaching nominal levels."[7]

In 2018, the Office of the Ranking Member for the Homeland Security and Governmental Affairs Committee in the United States Senate released a report after conducting an investigation of the Company's operations in Missouri (the "Missouri Report"). The Missouri Report concluded that AmerisourceBergen "had 'consistently failed to meet [its] reporting obligations' regarding suspicious orders"[8] and that the Company reported significantly less suspicious orders than other opioid distributors that shipped a similar number of opioid doses.

---

[7] *Id.* at *4.
[8] *Id.* (quoting the Missouri Report at 2).

6

In 2019, the New York Attorney General filed a complaint, naming AmerisourceBergen, among other opioid distributors and manufacturers, as a defendant (the "NYAG Complaint"). The NYAG Complaint alleged that the AmerisourceBergen's policies failed to properly identify suspicious orders and that the Company "'ha[d] consistently stood out as compared to its major competitors [because of] its unwillingness to identify suspicious orders, even among customers that regularly exceeded their thresholds and presented multiple red flags of diversion.'"[9]

AmerisourceBergen is also a defendant in multi-district litigation in the United States District Court for the Northern District of Ohio (the "Multidistrict Litigation"), which "centralizes 1,548 different lawsuits brought by state attorneys general, cities, counties, Native American tribes, union benefit funds, and other plaintiffs."[10] The plaintiffs in the Multidistrict Litigation, who also allege that AmerisourceBergen has failed to implement and maintain effective systems to flag suspicious orders, have successfully defended AmerisourceBergen's motion to dismiss and motion for summary judgment. In an effort to settle the ongoing Multidistrict Litigation, the Company and two other opioid distributors, offered to pay $10 billion. The regulators rejected the offer and demanded $45 billion.

---

[9] *Id.* (quoting the NYAG Complaint ¶ 727).
[10] *Id.* at *5.

To date, AmerisourceBergen "has spent more than $1 billion in connection with opioid-related lawsuits and investigations."[11]    Analysts estimate that AmerisourceBergen could spend up to $100 billion to reach a global settlement.

**B.    Procedural History**

In May 2019, amidst this "flood of government investigations and lawsuits relating to AmerisourceBergen's opioid practices,"[12] the Plaintiffs served a Section 220 demand on AmerisourceBergen, requesting inspection of thirteen categories of books and records (the "Demand").  The Plaintiffs requested Board Materials[13] from May 1, 2010 to date concerning certain settlements, acquisitions, investigations, and other events related to AmerisourceBergen's operations and its potential involvement in the opioid crisis.

The Demand listed four investigatory purposes:

(i)    to investigate possible breaches of fiduciary duty, mismanagement, and other violations of law by members of the Company's Board of Directors and management . . . in connection with [the Company]'s distribution of prescription opioid medications;

(ii)   to consider any remedies to be sought in respect of the aforementioned conduct;

---

[11] *Id.* at *1.

[12] *Id*. at *10.

[13] The Demand defined "Board Materials" as "documents dated from May 1, 2010 to the present that were provided at, considered at, discussed at, or prepared or disseminated, in draft or final form, in connection with, in anticipation of, or as a result of any meeting of the Company's Board or any regular or specially created committee thereof, including, without limitation, all presentations, Board packages, recordings, agendas, summaries, memoranda, charts, transcripts, notes, minutes of meetings, drafts of minutes of meetings, exhibits distributed at meetings, summaries of meetings, and resolutions."  App. to Opening Br. at A621.

8

(iii) to evaluate the independence and disinterestedness of the members of the Board; and

(iv) to use information obtained through inspection of the Company's books and records to evaluate possible litigation or other corrective measures with respect to some or all of these matters.[14]

AmerisourceBergen rejected the Demand in its entirety, claiming that the Demand did not state a proper purpose and that, even if the Plaintiffs' purpose were proper, the scope of the inspection was overbroad. In July 2019, the Plaintiffs filed this action in the Court of Chancery, seeking to compel production of the requested documents. The parties negotiated a schedule, during which they agreed that there would be no depositions and only limited discovery. During discovery, when the Plaintiffs served an interrogatory asking AmerisourceBergen to identify the individuals at the Company who had records responsive to the Demand, AmerisourceBergen objected to the interrogatory and declined to furnish the requested information.

In its memorandum opinion following trial on a paper record, the Court of Chancery found that the Plaintiffs had demonstrated a proper purpose sufficient to warrant the inspection of Formal Board Materials.[15] In reaching this conclusion, the Court of Chancery made several subsidiary findings. The court found that the

---

[14] *Id.* at A622–23.

[15] The Court of Chancery defined "Formal Board Materials" as "board level documents that formally evidence the directors' deliberations and decisions and comprise the materials that the directors formally received and considered," distinguishable from "Informal Board Materials" and "Officer-Level Materials," which are discussed in further detail later. *See AmerisourceBergen*, 2020 WL 132752, at *24–25.

Plaintiffs had established a credible basis, through "strong circumstantial evidence," to suspect that "AmerisourceBergen's situation did not result from any ordinary business decision that, in hindsight, simply turned out poorly,"[16] but instead may have been the product of the Company's violation of positive law. The Plaintiffs had not, according to the court, "approached AmerisourceBergen as part of an indiscriminate fishing expedition or out of mere curiosity."[17] The court also rejected AmerisourceBergen's contention that the Plaintiffs' sole purpose in seeking the inspection was to investigate a potential *Caremark*[18] claim, noting that the Plaintiffs' demand "reserved the ability to consider all courses of action that their investigation might warrant pursuing."[19] And finally, the court rejected AmerisourceBergen's contention that the Plaintiffs were required to show the wrongdoing they sought to investigate was "actionable" wrongdoing, but that, even if they were, it would be premature to consider the merits-based defenses advanced by AmerisourceBergen.

Next, because the Plaintiffs had satisfied their burden of proof under Section 220, the court concluded that the Plaintiffs were entitled to Formal Board Materials

---

[16] *Id.* at *11.
[17] *Id.*
[18] *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996); *see Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (holding that *Caremark* imposes director oversight liability where: "(a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention") (emphasis in original)
[19] *Id.* at *14.

relating to most of the events listed in the Demand.[20]   Finding that AmerisourceBergen had thwarted the Plaintiffs' efforts to establish "what types of books and records exist[ed] and who ha[d] them," the court then granted *sua sponte* the Plaintiffs leave to take a Rule 30(b)(6) deposition to seek answers to those questions and, if appropriate, seek additional documents.[21]

The Company moved for, and the Court of Chancery granted, certification of an interlocutory appeal on all three rulings.  In our order accepting the interlocutory appeal, we noted that the issues the Company had raised were "substantial issues of material importance relating to the scope of the statutory proper-purpose requirement when seeking books and records for the purpose of investigating management[] and the scope of the Court of Chancery's remedial discretion in a Section 220 action."[22]

On appeal, AmerisourceBergen challenges the Court of Chancery's opinion on three grounds.  First, AmerisourceBergen argues that the Court of Chancery erroneously found that the Plaintiffs had stated a proper purpose and need not "identify the objectives of the investigation."[23]  Second, the Company asserts that the court erroneously determined that the Plaintiffs had established a credible basis

---

[20] *Id.* at *27–29.
[21] *Id.* at *26.
[22] *AmerisourceBergen Corp. v. Lebanon Cnty. Emps.' Ret. Fund*, No. 60, 2020, at 5 (Del. Mar. 5, 2020) (ORDER) (accepting interlocutory appeal).
[23] Opening Br. at 16.

from which the court could suspect wrongdoing and that such wrongdoing need not be *actionable*. Finally, AmerisourceBergen contends that the Court of Chancery erred when it granted the Plaintiffs leave to conduct a post-trial Rule 30(b)(6) deposition.

## II. STANDARD OF REVIEW

We review *de novo* whether a stockholder's stated purpose for demanding inspection under Section 220 is a "proper purpose."[24] When a stockholder seeks to investigate corporate wrongdoing, the Court of Chancery's determination that a credible basis to infer wrongdoing exists is a mixed finding of fact and law, to which we afford considerable deference.[25] This Court reviews the scope of relief ordered in a books and records action for abuse of discretion.[26]

## III. ANALYSIS

A stockholder's right to inspect a corporation's books and records was "recognized at common law because '[a]s a matter of self-protection, the stockholder was entitled to know how his agents were conducting the affairs of the corporation of which he or she was a part owner.'"[27] Section 220(c) provides that stockholders who seek to inspect a corporation's books and records must establish that "(1) [s]uch

---

[24] *City of Westland Police & First Ret. Sys. v. Axcelis Techs., Inc.*, 1 A.3d 281, 287 (Del. 2010).
[25] *Id.*
[26] *Wal-Mart Stores, Inc. v. Ind. Elec. Workers Trust Fund IBEW*, 95 A.3d 1264, 1272 (Del. 2014).
[27] *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 119 (Del. 2006) (quoting *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 116 (Del. 2002)).

stockholder is a stockholder; (2) [s]uch stockholder has complied with [Section 220] respecting the form and manner of making demand for inspection of such documents; and (3) [t]he inspection such stockholder seeks is for a proper purpose."[28]   A proper purpose is a "purpose reasonably related to such person's interest as a stockholder."[29]

Myriad proper purposes have been accepted under Delaware law including: "the determination of the value of one's equity holdings, evaluating an offer to purchase shares, inquiring into the independence of directors, investigation of a director's suitability for office, testing the propriety of the company's public disclosures, investigation of corporate waste, and investigation of possible mismanagement or self-dealing."[30]   "[M]ere disagreement with a business

---

[28] 8 *Del. C.* § 220(c).
[29] *Id.* § 220(b).
[30] Donald J. Wolfe, Jr. & Michael A Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 9.07[e][1], at 9-143 to -144 (2d ed. 2019); *see also* Edward P. Welch et al., *Folk on the Delaware General Corporation Law*, *Fundamentals* § 220.05, at GCL-771 to -772 (2020 ed.) ("A stockholder may state a 'proper purpose' when he seeks to investigate allegedly improper transactions or mismanagement; to clarify an unexplained discrepancy in the corporation's financial statements regarding assets; to investigate the possibility of an improper transfer of assets out of the corporation; to ascertain the value of his stock; to inspect the stock ledger in order to contact other stockholders regarding litigation he has instituted and invite their association with him in the case; [t]o inform fellow shareholders of one's view concerning the wisdom or fairness, from the point of view of the shareholders, of a proposed recapitalization and to encourage fellow shareholders to seek appraisal; to discuss corporate finances and management's inadequacies and then, depending on the responses, determine stockholder sentiment for either a change in management or a sale pursuant to a tender offer; to inquire into the independence, good faith, and due care of a special committee formed to consider a demand to institute derivative litigation; to investigate director independence; to communicate with other stockholders regarding a tender offer; to communicate with other stockholders in order to effectuate changes in management policies; to investigate the stockholder's possible entitlement to oversubscription privileges in connection with a rights offering; to determine an individual's

13

decision"[31] will fail to establish a proper purpose. Once a stockholder shows that its primary purpose is reasonably related to its interest as a stockholder, the fact that it may also have "a further or secondary purpose . . . is irrelevant."[32]

For over a quarter-century, this Court has repeatedly encouraged stockholders suspicious of a corporation's management or operations to exercise this right to obtain the information necessary to meet the particularization requirements that are applicable in derivative litigation.[33] Section 220 has thus become a widely used tool for stockholders seeking information about corporate wrongdoing, mismanagement, or waste. This development, in turn, sparked "[t]he evolution of [our] jurisprudence

---

suitability to serve as a director; to obtain names and addresses of stockholders for a contemplated proxy solicitation; to inspect documents relating to a 'market check' on the terms of financing that may have been influenced by an interested party; or to obtain particularized facts needed to adequately allege demand futility after the corporation had admitted engaging in backdating stock options; or to investigate a private corporation's serial failure to convene annual stockholder meetings.") (internal quotations and internal citations omitted).

[31] *High River Ltd. P'ship v. Occidental Petroleum Corp.*, 2019 WL 6040285, at *5 (Del. Ch. Nov. 14, 2019) (citing *Deephaven Risk Arb. Trading Ltd. v. UnitedGlobalCom, Inc.*, 2005 WL 1713067, at *8 (Del. Ch. July 13, 2005)).

[32] *Gen. Time Corp. v. Talley Indus., Inc.*, 240 A.2d 755, 756 (Del. 1968).

[33] *Ca. State Teachers' Ret. Sys. v. Alvarez*, 179 A.3d 824, 839 (Del. 2018) ("[T]his Court has repeatedly admonished plaintiffs to use the 'tools at hand' and to request company books and records under Section 220 to attempt to substantiate their allegations before filing derivative complaints."); *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1056-57 (Del. 2004) (affirming the Court of Chancery's dismissal of plaintiff's derivative action where plaintiff had not sought inspection under Section 220 and thus had not "exhaust[ed] all reasonably available means of gathering facts"); *Seinfeld*, 909 A.2d at 122 (reiterating "the salutary use of [S]ection 220 as one of the 'tools at hand' for stockholders to use to obtain information" as observed in *Thomas & Betts*, *Grimes*, and *Security First*); *Grimes v. Donald*, 673 A.2d 1207, 1216 & n.11 (Del. 1996) (observing the utility of "using the 'tools at hand' to obtain the necessary information before filing a derivative action" (internal citation omitted)); *Rales v. Blasband*, 634 A.2d 927, 934 n.10 (recognizing that a plaintiff seeking to file a derivative complaint has "many avenues available to obtain information bearing on the subject of their claims," including "the summary procedure embodied in 8 *Del. C.* § 220").

14

in section 220 actions[,] reflect[ing] judicial efforts to maintain a proper balance between the rights of shareholders to obtain information based upon credible allegations of corporation mismanagement and the rights of directors to manage the business of the corporation without undue interference from stockholders."[34]

To avoid "indiscriminate fishing expedition[s]," a bare allegation of possible waste, mismanagement, or breach of fiduciary duty, without more, will not entitle a stockholder to a Section 220 inspection.[35] Rather, a stockholder seeking to investigate wrongdoing must show, by a preponderance of the evidence, a credible basis from which the court can infer there is "possible mismanagement as would warrant further investigation."[36] Although not an insubstantial threshold, the credible basis standard is the "lowest possible burden of proof."[37] A stockholder need not show that corporate wrongdoing or mismanagement has occurred in fact, but rather the "threshold may be satisfied by a credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing."[38] Once a stockholder has established a proper purpose, the stockholder will be entitled only to the "books and records that are necessary and essential to accomplish the stated, proper purpose."[39]

---

[34] *Seinfeld*, 909 A.2d at 122.
[35] *Id.*
[36] *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 568 (Del. 1997).
[37] *Seinfeld*, 909 A.2d at 123.
[38] *Id.*
[39] *Saito*, 806 A.2d at 116.

## A.    The Plaintiffs' Proper Purpose

In the Court of Chancery, AmerisourceBergen argued that the Plaintiffs failed to demonstrate a credible basis to investigate a *Caremark* claim, which, according to the Company, was "the only purported purpose of the Demand."[40]    The court disagreed with AmerisourceBergen's characterization of the Demand, noting that the Demand "signaled that [the Plaintiffs] are not solely interested in filing a derivative lawsuit . . . [and] are open to considering other possible remedies, corrective measures, and methods of addressing the wrongdoing that they believe has occurred."[41]  The court further understood AmerisourceBergen to "maintain[] that if a stockholder wants to investigate wrongdoing and use the resulting documents to achieve an end other than filing litigation, the stockholder must say so in the demand."[42]

After a thoughtful analysis of Section 220's proper-purpose requirement, which included a review of a line of authority in the Court of Chancery requiring stockholders who want to investigate corporate wrongdoing "to state up-front what

---

[40] App. to Opening Br. at A869.

[41] *AmerisourceBergen*, 2020 WL 132752, at *7.

[42] *Id.* at *11.  This understanding is apparently derived from AmerisourceBergen's contention in its Opening Trial Brief that "[a]part from a vague and conclusory (and thus insufficient) comment that [the Plaintiffs] may take 'appropriate action' following their inspection, the Demand's only concretely stated purpose is to investigate breaches of fiduciary duty in preparation for derivative litigation."  App. to Opening Br. at A869.  In this Court, AmerisourceBergen frames the issue less obliquely, contending that "[t]he lower court erred by holding that a stockholder seeking to investigate wrongdoing is not required to identify the objectives of the investigation."  Opening Br. at 16.

they plan[] to do with the fruits of the inspection,"[43] the court concluded that, although "the Demand did not recite ends to which the [P]laintiff[s] might put the books and records[,] . . . they were not required to do so. Instead the [P]laintiffs reserved the ability to consider all possible courses of action that their investigation might warrant pursuing."[44] We, too, reject AmerisourceBergen's characterization of the Plaintiffs' Demand as solely limited to pursuing derivative litigation. And we agree with the Court of Chancery's observation that a stockholder is not required to state the objectives of his investigation.[45]

AmerisourceBergen acknowledges that investigating corporate wrongdoing is a widely recognized proper purpose under Section 220. Yet it claims that "whether that purpose in a specific case is reasonably related to the stockholder's interest as a stockholder cannot be ascertained in a vacuum."[46] According to AmerisourceBergen, "[t]he objectives of the investigation will dictate whether the purpose is in fact a proper purpose."[47] And AmerisourceBergen contends that, unless those objectives are explicitly disclosed in the stockholder's demand, "the

---

[43] AmerisourceBergen, 2020 WL 132752, at *12.
[44] *Id.* at *14.
[45] Although we agree with the Court of Chancery's ultimate conclusion regarding the Plaintiffs' Demand, we interpret the Demand as stating the objectives of the Plaintiffs' investigation—*i.e.*, pursuing litigation, making a demand on the Company's board of directors, and other corrective measures.
[46] Opening Br. at 19.
[47] *Id.*

17

corporation [will be] impaired, if not entirely thwarted in its efforts to evaluate the propriety of the demand's purpose"[48] without resorting to litigation.

AmerisourceBergen concedes that this Court has not considered whether a stockholder must state in its demand the objectives of an investigation of corporate wrongdoing. Therefore, the Company relies heavily on *Northwest Industries, Inc. v. B.F. Goodrich Co.*[49] ("*Northwest Industries*"), a case involving a stockholder's request to inspect the company's list of stockholders. The majority in *Northwest Industries* held that, in that context, a demand that contained "a mere statement" that the purpose of the inspection was "to communicate with other stockholders"[50] was inadequate. In the majority's view:

> [Section] 220 required Goodrich to state in its demand the substance of its intended communication sufficiently to enable Northwest, and the courts if necessary, to determine whether there was a reasonable relationship between its purpose, i.e., the intended communication, and Goodrich's interest as a stockholder of Northwest.[51]

But a request to inspect a list of stockholders is fundamentally different than a request to inspect books and records in furtherance of an investigation of corporate wrongdoing.[52] A corporation cannot discern whether the inspection of its list of stockholders for the purpose of communicating with other stockholders is related to

---

[48] *Id.* at 23.

[49] 260 A.2d 428 (Del. 1969).

[50] *Id.* at 429.

[51] *Id.*

[52] For the same reason, we find the Court of Chancery opinions addressing share-valuation inspections cited by AmerisourceBergen inapposite.

the stockholder's interest as a stockholder without a disclosure of the substance of the intended communication. By contrast, corporate wrongdoing is, as the Court of Chancery noted, in and of itself "a legitimate matter of concern that is reasonably related to [a stockholder's] interest[] as [a] stockholder[]."[53]

We have recognized that, when a stockholder investigates meritorious allegations of possible mismanagement, waste, or wrongdoing, it serves the interests of all stockholders "and should increase stockholder return."[54] It follows that, under such circumstances, the stockholder's purpose is proper. Of course, a mere statement of suspicion is inadequate. If the stockholder cannot present a credible basis credible basis from which the court can infer wrongdoing or mismanagement, it is likely that the stockholder's demand is an "indiscriminate fishing expedition."[55] But where a stockholder meets this low burden of proof from which possible wrongdoing or mismanagement can be inferred, a stockholder's purpose will be deemed proper under Delaware law.[56]

AmerisourceBergen contends that "this Court has expressly recognized that the objectives of an investigation are critical to a determination whether an investigative purpose is reasonably related to the stockholders' interests as a

---

[53] *AmerisourceBergen*, 2020 WL 132752, at *11.
[54] *Seinfeld*, 909 A.2d at 121 (citing *Saito*, 806 A.2d at 115).
[55] *Id.* at 122.
[56] *See, e.g.*, *KT4 Partners LLC v. Palantir Techs. Inc.*, 203 A.3d 738, 758 (Del. 2019); *Seinfeld*, 909 A.2d at 123; *Sec. First Corp.*, 687 A.2d at 567–69; *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1031 (Del. 1996).

stockholder,"[57] citing *Saito v. McKesson HBOC, Inc.*[58] ("*Saito*"). AmerisourceBergen's reliance on *Saito* is misplaced. In that case, we addressed the interplay of the standing requirement in 8 *Del. C.* § 327[59] and books-and-records inspections under Section 220. Admittedly, we said—as quoted by AmerisourceBergen—that "[i]f a stockholder wanted to investigate alleged wrongdoing that substantially predated his or her stock ownership, there could be a question as to whether the stockholder's purpose was reasonably related to his or her interest as a stockholder, especially if the stockholder's only purpose was to institute derivative litigation."[60]

AmerisourceBergen omits, however, the following qualification of that observation:

> But stockholders may use information about corporate mismanagement in other ways, as well. They may seek an audience with the board to discuss proposed reforms or, failing in that, they may prepare a stockholder resolution for the next annual meeting, or mount a proxy fight to elect new directors. None of those activities would be prohibited by § 327.[61]

---

[57] Opening Br. at 22.

[58] *Saito*, 806 A.2d at 117.

[59] 8 *Del. C.* § 327 ("In any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which such stockholder complains or that such stockholder's stock thereafter devolved upon such stockholder by operation of law.").

[60] *Saito*, 806 A.2d at 117.

[61] *Id.*

None of these post-inspection uses of the company's books and records were included in the purpose stated in Saito's demand, yet we recognized that they remained available to him.[62]    Thus, our reading of *Saito* undermines AmerisourceBergen's contention that a stockholder who seeks an inspection for the purpose of investigating mismanagement or wrongdoing must state in the demand all of the ways it might use the documents uncovered in the investigation.

This is not to say that the stockholder's intended uses are irrelevant or that it is not advisable, in the interest of enhancing litigation efficiencies—to state the intended uses in the stockholder's demand.  And we agree with the Court of Chancery that a corporation may challenge the *bona fides* of a stockholder's stated purpose and present evidence from which the court can infer that the stockholder's stated purpose is not its actual purpose.  Or the court, when assessing the propriety of a stockholder's purpose, can imply—as it did in *West Coast Management & Capital, LLC v. Carrier Access Corp.*[63] ("*West Coast Management*") and *Pershing*

---

[62] *Id*. at 115 ("The stated purpose of Saito's demand was:  (1) to further investigate breaches of fiduciary duties by the boards of directors of HBO & Co., Inc., McKesson, Inc., and/or McKesson HBOC, Inc. related to their oversight of their respective company's accounting procedures and financial reporting; (2) to investigate potential claims against advisors engaged by McKesson, Inc. and HBO & Co, Inc. to the acquisition of HBO & Co., Inc. by McKesson, Inc.; and (3) to gather information relating to the above in order to supplement the complaint in *Ash v. McCall, et al*., … in accordance with the September 15, 2000 Opinion of the Court of Chancery.").

[63] 914 A.2d 636, 640 (Del. Ch. 2006) ("The complaint, like the demand letter, articulates that the sole purpose [of the inspection] is to investigate wrongdoing.  Implicit in both is that the investigation is targeted at reinitiating derivative litigation.").

*Square, L.P. v. Ceridian Corp.*[64]—what the stockholders' intended use of the books and records will be. But when the purpose of an inspection of books and records under Section 220 is to investigate corporate wrongdoing, the stockholder seeking inspection is not required to specify the ends to which it might use the books and records.

## B. The Relevance of Actionability

The previous argument—that the Plaintiffs' sole purpose in seeking to inspect AmerisourceBergen's books and records is to pursue a *Caremark* claim and the court should not consider other potential uses of the documents—would not, standing alone, suffice to defeat the Plaintiffs' inspection rights. After all, AmerisourceBergen concedes that the evaluation of litigation options is an appropriate objective of an investigative Section 220 demand. As the Court of Chancery recognized, however, AmerisourceBergen's attempt to cabin the Plaintiffs' use of its books and records to their pursuit of a *Caremark* claim, merely set the stage for AmerisourceBergen's "launching [of] merits-based strikes on the lawsuit that AmerisourceBergen expects the Plaintiffs to file someday."[65] Such strikes are justified, AmerisourceBergen contends, because the Plaintiffs must

---

[64] 923 A.2d 810, 819 (Del. Ch. 2007) ("Although Pershing Square states proper purposes, the evidence overwhelmingly establishes, and I find as a fact, that despite the stated proper purposes, one improper purpose drives Pershing Square's demand and this litigation: to find a legal vehicle by which Pershing Square can publicly broadcast improperly obtained confidential information.").
[65] *AmerisourceBergen*, 2020 WL 132752, at *11.

establish that the wrongdoing they seek to investigate is *actionable* wrongdoing. And, according to AmerisourceBergen, the Plaintiffs' claims are not actionable because they are legally barred by a Section 102(b)(7) exculpatory provision in its certificate of incorporation and by laches.

The Court of Chancery rejected AmerisourceBergen's argument on three grounds. First, the court found that the argument failed for the "threshold reason … [that] [t]he [P]laintiffs are not seeking the books and records for the sole purpose of investigating a potential *Caremark* claim . . . [and thus] can use the fruits of their investigation for other purposes."[66] Second, the court held that "to obtain books and records, a stockholder does not have to introduce evidence from which a court could infer the existence of an actionable claim."[67] Third, the court found that, in any event, AmerisourceBergen's Section 102(b)(7) and laches defenses were unavailing. As to the Section 102(b)(7) defense, the court found that "[t]he issues that the [P]laintiffs wish to investigate could well lead to non-exculpated claims."[68] And as to the laches defense, it was not clear to the court that the Plaintiffs' potential derivative claims were time-barred, given the possibility that the doctrines of fraudulent concealment and equitable tolling could apply. Our agreement with the

---

[66] *Id*. at *14.
[67] *Id*. at *15.
[68] *Id.* at *20.

Court of Chancery on any one of these three grounds would be sufficient to lay AmerisourceBergen's argument to rest; we happen to agree on all three.

As mentioned, the *sine qua non* of AmerisourceBergen's contention that the Plaintiffs must establish a credible basis from which actionable wrongdoing can be inferred is that the Plaintiffs "are only seeking to investigate a *Caremark* claim."[69] To support this claim, AmerisourceBergen contends that the Demand, as well as the Plaintiffs' complaint and pre-trial briefing, is "littered with assertions" that the company's board of directors "ignored red flags"[70]—language that suggests an investigation of a *Caremark* failed-oversight clam. AmerisourceBergen asserts that the Plaintiffs' engagement letters with counsel "unquestionably establish"[71] that the Plaintiffs are only seeking books and records in contemplation of litigation.

AmerisourceBergen's assertions go too far. A stockholder may state more than one purpose for inspection and use the information obtained for more than one purpose.[72] As already mentioned, a stockholder may use the information supporting a claim of mismanagement obtained through an inspection for purposes other than bringing litigation.[73] Although AmerisourceBergen correctly identifies several

---

[69] Opening Br. at 34.
[70] *Id.* at 33–34.
[71] *Id.* at 35.
[72] *See CM & M Group, Inc. v. Carroll*, 453 A.2d 788, 792 ("Since such a shareholder will often have more than one purpose, that requirement has been construed to mean that the shareholder's primary purpose must be proper; any secondary purpose, whether proper or not, is irrelevant.").
[73] *See Saito*, 806 A.2d at 117 (reasoning that stockholders "may seek an audience with the board to discuss proposed reforms or, failing in that, they may prepare a stockholder resolution for the

references to potential litigation in the Demand, the Demand also states that the information sought will be used "to evaluate . . . other corrective measures with respect to all or some of these matters."[74] The Demand also contemplates a "[p]ossible course[] of conduct [to] include making a demand on the Company's Board of Directors to take action."[75] In our view, the Court of Chancery's determination that the Plaintiffs contemplated purposes *other than* litigation is supported by a fair reading of the Demand. We need go no further than that to dispose of AmerisourceBergen's "actionability" argument. We nevertheless take this opportunity to dispel the notion that a stockholder who demonstrates a credible basis from which the court can infer wrongdoing or mismanagement must demonstrate that the wrongdoing or mismanagement is actionable.

As noted above, under Section 220, a stockholder who wishes to investigate corporate wrongdoing must present a credible basis from which the court can infer that wrongdoing may have occurred.[76] It bears repeating that this test "reflects judicial efforts to maintain a proper balance between the rights of shareholders to obtain information based upon credible allegations of corporation mismanagement

---

next annual meeting, or mount a proxy fight to elect new directors"); *Graulich v. Dell Inc.*, 2011 WL 1843813, at *7 (Del. Ch. May 16, 2011) (describing alternative purposes related to the investigation of corporate wrongdoing other than pursuing litigation, such as a general proposition to "'take appropriate action' if it were found that the directors breached their duties").

[74] App. to Opening Br. at A622–23.

[75] *Id.* at A623.

[76] *Seinfeld*, 909 A.2d at 122 (quoting *Thomas & Betts Corp.*, 681 A.2d at 1031).

and the rights of directors to manage the business of the corporation without undue interference from stockholders."[77] Having struck that balance, this Court has not required stockholders to prove that the wrongdoing they seek to investigate is actionable. To the contrary, we have stated that a stockholder is not required to prove that wrongdoing occurred,[78] only that there is "possible mismanagement that would warrant further investigation."[79]

It is true that the Court of Chancery has disallowed inspections for the purpose of investigating mismanagement and wrongdoing when the stockholder's sole objective is to pursue litigation that faces an insurmountable procedural obstacle. For example, in *Polygon Global Opportunities Master Fund v. West Corp.* ("*Polygon*"), where the stockholder lacked standing to bring the anticipated claim, the Court of Chancery denied inspection even in the face of a credible showing of wrongdoing.[80] Likewise, the court has denied inspection by stockholders whose sole purpose is to evaluate litigation options when the claims under consideration are time barred, as was the case in *Graulich v. Dell, Inc.*[81] ("*Graulich*"), or otherwise

---

[77] *Id.*

[78] *Id.*; *see Sec. First Corp.*, 687 A.2d at 568; *City of Westland Police & First Ret. Sys.*, 1 A.3d at 287.

[79] *Sec. First Corp.*, 687 A.2d at 568 (quoting *Thomas & Betts Corp.*, 681 A.2d at 1031).

[80] *Polygon Global Opportunities Master Fund v. W. Corp.*, 2006 WL 2947486, at *5 (Del. Ch. Oct. 12, 2006).

[81] *Graulich*, 2011 WL 1843813, at *5.

26

precluded, as in *West Coast Management*.[82]  It should be stressed that, in each of these instances, the sole reason for the stockholder's demand was to pursue litigation and the obstacle that blocked the stockholder's path was the product of a determinate procedural history and based on undisputed facts.  We find all of these decisions to be within the discretion that rests in the Court of Chancery's hands when it assesses the *bona fides* of a stockholder's stated purpose under Section 220.  If litigation is the stockholder's sole objective but an insurmountable procedural obstacle unrelated to the suspected corporate wrongdoing bars the stockholder's path, it cannot be said the stockholder's stated purpose is its actual purpose.  Given the obvious futility of the litigation the stockholder claims to have in mind, the investigation can only be seen as assuaging the stockholder's idle curiosity or a fishing expedition.

Yet AmerisourceBergen points us to two more recent Court of Chancery opinions, one of which we summarily affirmed, that considered merits-based defenses, not to the Section 220 action before the court but, to the anticipated plenary action that might follow.  In *Southeastern Pennsylvania Transportation Authority v.*

---

[82] *W. Coast Mgmt. & Capital, LLC*, 914 A.2d at 646 (finding plaintiff's sole purpose was to replead demand futility in a second derivative claim, a claim which issue preclusion "completely bar[red] West Coast from pursuing").  *But see In re UnitedHealth Grp., Inc. Section 220 Litig.*, 2018 WL 1110849, at *7 (Del. Ch. Feb. 28, 2018) (permitting inspection and declining to address merits-based defenses that require . . . [an analysis of] the strengths and weaknesses of the underlying [action] . . . and potential derivative claims") ; *Khanna v. Covad Commc'ns Grp., Inc.*, 2004 WL 187274, at *6 (Del. Ch. Jan. 23, 2004) (permitting inspection, recognizing "the question is not whether [the company] can raise substantial doubt about the viability of [the stockholder's] claims of wrongdoing . . . [but rather whether the stockholder] provides a credible basis for believing that wrongdoing may have occurred").

*AbbVie, Inc.*[83] ("*AbbVie*"), the Section 220 plaintiffs sought to inspect the company's books and records to investigate possible breaches of fiduciary duties and mismanagement in connection with a failed inversion merger that resulted in the company's payment of a $1.635 billion break-up fee. In short, after AbbVie negotiated the terms of the transaction, including the break-up fee, the United States Treasury Department changed its interpretation of a tax law in a way that eliminated the tax advantages that the AbbVie board hoped to reap in the as-yet unconsummated merger. In light of the new interpretation, the AbbVie board, concluding it was in the best interests of the company, terminated the merger and paid the break-up fee. According to the plaintiff stockholders, the risk of losing the tax advantage was well-known in advance of the negotiations and "was so substantial, and so obvious, that the directors must have breached their fiduciary duties to the stockholders by entering the deal."[84] They therefore sought to inspect AbbVie's books and records for the purpose of investigating the "mismanagement, wrongdoing and waste by

---

[83] 2015 WL 1753033 (Del. Ch. Apr. 15, 2015), *aff'd*, 132 A.3d 1, 2016 WL 235217 (Del. Jan. 20, 2016) (TABLE).
[84] *Id*. at *1.

AbbVie's directors and officers in connection with AbbVie's obligation to pay the $1.635 billion Break Fee."[85]

Although the Court of Chancery expressed dismay at the stockholders' failure to specify the "end" to which their investigation would lead, the court inferred that the stockholders sought "an investigation to aid in future derivative litigation."[86] AbbVie challenged the propriety of this purpose on the grounds that AbbVie's certificate of incorporation exculpated its directors from liability for a breach of duty of care in accordance with Section 102(b)(7) of the DGCL. Therefore, according to AbbVie, the stockholders were without a remedy in a derivative action against the directors for a breach of the duty of care, hence, "investigating any such breach [was] futile and not a proper purpose for a Section 220 demand."[87]

In addressing AbbVie's defense, the Court of Chancery acknowledged that it had "not squarely addressed the issue of whether, when a stockholder seeks to investigate corporate wrongdoing *solely* for the purpose of evaluating whether to bring a derivative action, the 'proper purpose' requirement under Section 220 is limited to investigating non-exculpated corporate wrongdoing."[88]

---

[85] *Id*. at *11.
[86] *Id*. at *12.
[87] *Id*. at *13.
[88] *Id.* (emphasis in original).

29

After surveying the "analogous decisions"[89] mentioned above denying inspection because of procedural bars to the litigation of claims derived from an investigative inspection, the court concluded that:

> [those] holdings, and the necessity of proper balance of the benefits and burdens of production under Section 220, illustrate that the proper purpose requirement under that statute requires that, if a stockholder seeks inspection solely to evaluate whether to bring derivative litigation, the corporate wrongdoing which he seeks to investigate must necessarily be justiciable.[90] Because a Section 102(b)(7) exculpatory provision serves as a bar to stockholders recovering for certain director liability in litigation, a stockholder seeking to use Section 220 to investigate corporate wrongdoing solely to evaluate whether to bring derivative litigation has stated a proper purpose only insofar as the investigation targets non-exculpated corporate wrongdoing. Here, that means that [the stockholders'] stated purpose to investigate whether wrongdoing is proper only to investigate whether AbbVie's directors breached their fiduciary duty of loyalty.[91]

To skirt the exculpatory provision, the stockholders alleged that the AbbVie directors breached the duty of loyalty by acting in bad faith or by committing waste. The court found that the stockholders could not clear either of these hurdles and therefore denied the stockholders' demand for inspection, and the stockholders appealed to this Court.

---

[89] *Id.*; *see supra* notes 80–82.

[90] The court appears to have used the words "justiciable" and "actionable" interchangeably.

[91] *AbbVie,* 2015 WL 1753033, at *13 (internal citations omitted).

In a one-paragraph order, a majority of this Court affirmed the Court of Chancery's judgment "on the basis of" its decision as summarized above.[92] Two Justices, however, thought that:

> it was unnecessary for the Court of Chancery to reach and rely upon Section 102(b)(7) in its analysis, and given their broader substantive concerns regarding reliance on Section 102(b)(7) in Section 220 proceedings, would affirm solely on the basis that the petitioner did not show a preponderance of the evidence that there existed a credible basis to conclude that even a breach of the duty of care had been committed.[93]

The footnote registering the concurring Justices' concerns clarified that the entire panel agreed that the petitioner had failed to show a credible basis from which a duty-of-care breach, i.e., wrongdoing or mismanagement, could be inferred, "but the other three members of the panel believe[d] that it was proper for the Court of Chancery to address the matter in the precise manner that it did, because that was the primary ground on which the defendant corporation below defended the case and the parties framed the issue."[94]

Soon after we affirmed *AbbVie*, the Court of Chancery decided *Beatrice Corwin Living Irrevocable Trust v. Pfizer, Inc.*[95] ("*Pfizer*"). Here, in the Court of Chancery, AmerisourceBergen relied on *Pfizer* in support of its argument that, "[w]here a stockholder seeks to investigate mismanagement or wrongdoing solely

---

[92] *AbbVie*, 2016 WL 235217, at *1.
[93] *Id*. at *1 n.6.
[94] *Id*.
[95] 2016 WL 4548101 (Del. Ch. Sept. 1, 2016).

31

for potential litigation, the evidence the stockholder presents to establish a credible basis must be evidence of 'actionable corporate wrongdoing.'"[96]

In *Pfizer*, the stockholders alleged that the company had violated accounting and disclosure laws when it failed to disclose a deferred tax liability in an annual report on the basis that calculation of liability was "not practicable."[97] The stockholder sent a books-and-records demand to Pfizer, identifying the following purposes of the inspection: "(i) evaluating potential derivative or shareholder litigation, including investigating possible breaches of fiduciary duties by Pfizer's board of directors (the 'Board') for failing to assure compliance with applicable accounting rules[,] and (ii) valuing the [Trust's] shares."[98]

Pfizer refused to permit the inspection, and the stockholder filed a Section 220 action to enforce its inspection rights. At trial, the stockholder presented expert testimony that it was practicable to calculate the deferred tax liability, thus providing a credible basis—the stockholder claimed— from which the court could infer that the disclosure was inaccurate. But the stockholder's trial presentation did not address Pfizer's reporting system or the Pfizer board's disregard of any red flags. In

---

[96] App. to Opening Br. at A868 (quoting *Pfizer*, 2016 WL 4548101, at *6). AmerisourceBergen also relied on *Pfizer* in support of its contention that, to warrant investigation of a failed oversight claim, the stockholder must provide evidence from which the court can infer board-level wrongdoing. AmerisourceBergen's arguments on appeal do not challenge whether the evidence provided by the stockholders suggests board-level wrongdoing as opposed to officer-level or other corporate wrongdoing, but rather attack the sufficiency of the evidence presented.

[97] *Pfizer*, 2016 WL 4548101, at *2.

[98] *Id*. (alterations in original).

consequence, the court found that the stockholder failed to establish a credible basis from which the court could infer that Pfizer directors breached their duty of oversight.

This finding does not concern us here. Rather, we discuss *Pfizer* because of the next step in the Court of Chancery's analysis. Specifically, the court noted that the stockholder had failed to address the Pfizer board's reliance on an unqualified opinion from the company's auditors that Pfizer's financial statements were prepared in accordance with generally accepted accounting principles. The court observed that "[u]nder 8 *Del. C.* § 141(e), directors are 'fully protected' in relying in good faith on the expert's opinions as to matters the director reasonably believes are within the expert's competence, provided the expert was selected with reasonable care."[99] And because the stockholder failed to present any evidence to overcome§ 141(e)'s presumptions, the court found the stockholder's "credible basis argument"[100] wanting.

What interests us here is the *Pfizer* court's reliance on *AbbVie:*

The reasoning in *Abbvie* applies equally here. That is, where a stockholder seeks to investigate mismanagement or wrongdoing solely for potential litigation, the evidence the stockholder presents to establish a credible basis must be evidence of "actionable corporate wrongdoing." As the *Abbvie* Court pointed out, other decisions of this Court have concluded that a stockholder does not have a credible basis to investigate mismanagement or wrongdoing if the litigation the

---

[99] *Id*. at *6.
[100] *Id*. at *7.

stockholder is evaluating would be barred by claim or issue preclusion, lack of standing, or the statute of limitations. So too, where a stockholder's sole basis is litigation-driven and the claim he seeks to investigate is not justiciable due to a statutory defense, there is no valid purpose for the inspection.[101]

Thus, it seems that the practical principles applied in *Polygon*, *West Coast Management*, and *Graulich* to deny inspections whose ultimate and sole purpose was to facilitate litigation that would be dead on arrival because of an insurmountable procedural obstacle have been extended in *AbbVie* and *Pfizer* to welcome the invocation in Section 220 actions of merits-based defenses that companies anticipate will be raised in the ensuing—if any there shall be—plenary actions.

This trend, if it can be called that, has met with resistance in other Court of Chancery decisions, as evidenced by the case under consideration here. For instance, in *Amalgamated Bank v. Yahoo! Inc.*[102] (*Yahoo!*") a case that bears a resemblance to the one before us now, the court found that, even where the plaintiff's likelihood of prevailing on a non-exculpated claim appeared slim but where the plaintiff had established a credible basis from which the Court of Chancery could

---

[101] *Id.* at *6 (internal citations omitted).
[102] 132 A.3d 752 (Del. Ch. 2016), *abrogated on other grounds by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019).

infer mismanagement, the potential for exculpation would not warrant defeat the stockholder's inspection rights.[103]

In a similar manner, in *Lavin v. West Corp.*[104] ("*Lavin*"), the Court of Chancery steered away from the consideration of a merits-based defense to the claims a stockholder sought to investigate. In that case, following West Corporation's merger with Appollo Global Management, Lavin served a books-and-records demand on West for the purpose of "determin[ing] whether wrongdoing and mismanagement had taken place"[105] in connection with the merger. West rejected the demand, and Lavin sued. West contended that, under the *Corwin* doctrine,[106] the stockholder vote approving the merger "cleansed" any breaches of fiduciary duty, leaving the merger subject to challenge only on the grounds of waste, which Lavin had not stated as a basis for inspection. The court declined West's invitation to "engage with *Corwin*" in the Section 220 proceeding:

> …the notion that the court would engage with *Corwin*, and all that it entails, in a summary Section 220 proceeding has little to commend it as a matter of procedure, at least in the view of this trial judge. Simply stated, *Corwin* does not fit within the limited scope and purpose of a books and records action in this court. Our law is settled that stockholders seeking books and records under Section 220 for the purpose of investigating mismanagement need not prove that

---

[103] *Id*. at 786.
[104] 2017 WL 6728702 (Del. Ch. Dec. 29, 2017).
[105] *Id.* at *1.
[106] In *Corwin v. KKR Fin. Holdings, LLC*, we held that "the business judgment rule is the appropriate standard of review for a transaction that is not otherwise subject to entire fairness review and that has been approved by a fully-informed, uncoerced vote of a majority of disinterested stockholders." 125 A.3d 304, 305–06 (Del. 2015).

wrongdoing or mismanagement actually occurred. Thus, when a stockholder demands inspection as a means to investigate wrongdoing in contemplation of a class or derivative action, Delaware courts generally do not evaluate the viability of the demand based on the likelihood that the stockholder will succeed in a plenary action. In the rare circumstances where inspection rights have been denied based on an assessment of the merits of the claim the stockholder seeks to investigate, the courts have emphasized either that the claim was simply not "justiciable," or that the claim on its face was not viable as a matter of law. In either event, it was clear to the court that no amount of additional information would aid the stockholder in pleading or prosecuting the contemplated plenary action, so the inspection demand was denied.[107]

And as recently as last month in *Pettry v. Gilead Sciences, Inc.*[108] ("*Gilead*"), the Court of Chancery granted a stockholder's inspection request over the corporation's objections that the stockholder lacked standing to pursue follow-on derivative claims, which, in any event, would be time-barred and barred by the corporation's exculpatory charter provision.

It could be said that the Court of Chancery opinions on both sides of this apparent divide can be harmonized; on one side stand *Polygon*, *West Coast Management*, *Graulich*, *AbbVie*, and *Pfizer*, where the stockholder's sole purpose for seeking inspection is to pursue litigation, and on the other stand this case, *Yahoo!* and *Gilead*, where the stockholders have not limited themselves to pursuing litigation. Under the first set of circumstances, one might contend that defenses to

---

[107] *Lavin*, 2017 WL 6728702, at *1.
[108] 2020 WL 6870461 (Del. Ch. Nov. 24, 2020).

the anticipated litigation, including merits-based defenses, should be considered in the Section 220 proceeding, but not in the second.[109]

We think, however, that the apparent tension that has developed between these two approaches should be relieved in a manner that better serves the purpose and nature of Section 220 proceedings, which, after all, are intended to be "summary," and thus "managed expeditiously."[110] It has become evident that the interjection of merits-based defenses—defenses that turn on the quality of the wrongdoing to be investigated—interferes with that process. As the Court of Chancery has noted, a Section 220 proceeding "is not the time for a merits assessment of Plaintiffs' potential claims against [the corporation's] fiduciaries."[111] We therefore reaffirm the "credible basis" test as the standard by which investigative inspections under Section 220 are to be judged. To obtain books and records, a stockholder must show, by a preponderance of the evidence, a credible basis from which the Court of Chancery can infer there is possible mismanagement or wrongdoing warranting further investigation. The stockholder need not demonstrate that the alleged mismanagement or wrongdoing is actionable. To the extent that our summary affirmance in *AbbVie* suggests otherwise, we hereby overrule it.[112]

---

[109] Admittedly, *Lavin* hits a discordant note in this attempt at harmony.

[110] *Brehm v. Eisner*, 746 A.2d 244, 267 (Del. 2000).

[111] *In re Facebook, Inc. Section 220 Litig.*, 2019 WL 2320842, at *2 (Del. Ch. May 30, 2019).

[112] For the reasons stated above, we still believe that the Court of Chancery reached the correct result in *AbbVie*. *See supra* text accompanying notes 83–94.

In the rare case in which the stockholder's sole reason for investigating mismanagement or wrongdoing is to pursue litigation and a purely procedural obstacle, such as standing or the statute of limitations, stands in the stockholder's way such that the court can determine, without adjudicating merits-based defenses, that the anticipated litigation will be dead on arrival, the court may be justified in denying inspection. But in all other cases, the court should—as the Court of Chancery did here—defer the consideration of defenses that do not directly bear on the stockholder's inspection rights, but only on the likelihood that the stockholder might prevail in another action.

## C. The Plaintiffs' Rule 30(b)(6) Deposition

After finding that the Plaintiffs were entitled to inspection, the Court of Chancery turned to its determination of the scope of the inspection. The court started its discussion by categorizing the types of documents falling within the definition of Board Materials set forth in the Demand that might be necessary and essential to satisfy the Plaintiffs' investigative purpose. The court interpreted the definition of the term "Board Materials" to encompass three categories: Formal Board Materials, Informal Board Materials, and Officer-Level Documents.

The court then found that the Plaintiffs' Demand encompassed books and records falling within each of those categories, noting, however, that determining whether a stockholder is entitled to a particular category is a fact-specific inquiry

that depends "on the context in which the shareholder's inspection demand arises."[113]  Recognizing that this is a difficult task—one that "generally needs to proceed on a category-by-category basis,"[114]—the court concluded that AmerisourceBergen had created an additional obstacle to conducting the inquiry when it refused to disclose in discovery the types and custodians of the records it maintains.  Consequently, in addition to ordering the production of Formal Board Materials, the court granted *sua sponte* the Plaintiffs leave to conduct a Rule 30(b)(6) deposition "to explore what types of books and records exist and who has them."[115] After the deposition, the parties were to confer on a final production order and if they were unable to reach an agreement, the court left the door open to a request from the Plaintiffs seeking "any additional Informal Board Materials or Officer-Level Documents that they can show are necessary for their inspection."[116]

AmerisourceBergen challenges the Court of Chancery's grant of leave to conduct a Rule 30(b)(6) deposition on three grounds.  First, AmerisourceBergen says that the court's decision effectively relieved the Plaintiffs of their burden of proving what documents are essential to achieving their investigative purpose.  Second, AmerisourceBergen claims that the court's discovery directive conflicts with our

---

[113] *AmerisourceBergen*, 2020 WL 132752, at *25 (quoting *Wal-Mart Stores, Inc.*, 95 A.3d at 1273).
[114] *Id.*
[115] *Id*. at *29.
[116] *Id*.

39

holding in *KT4 Partners LLC v. Palantir Technologies Inc.*[117] ("*Palantir*"). And third, AmerisourceBergen argues that the discovery directive impermissibly expands the categories of documents sought beyond those identified in the Demand. We address these contentions in turn.

### 1.    The Burden of Proof

AmerisourceBergen's claim that the Court of Chancery's allowance of a post-trial deposition impermissibly shifted the burden of proof is, in our view, based on a mischaracterization of the court's opinion. In particular, the argument assumes that the court ruled that, at trial, the Plaintiffs *only* satisfied their burden of proof as to the Formal Board Materials. We do not read the court's opinion so narrowly. We understand the court to have found that the Plaintiffs were entitled to the Formal Board Materials and to have reserved judgment, subject to additional discovery, as to the Informal Board Materials and the Officer-Level Documents. Seen in that light, the court's ruling is a discovery ruling in an ongoing proceeding and thus within the court's discretion.[118] But even if the ruling were to be viewed as the court's post-trial remedial order, the ruling is still within the court's discretion.[119] In either case,

---

[117] 203 A.3d 738.
[118] *Mann v. Oppenheimer*, 517 A.2d 1056, 1061 (Del. 1986) ("The application of the discovery rules is subject to the exercise of the trial court's sound discretion.").
[119] Under Section 220(c)(3), the Court of Chancery may "in its discretion, prescribe any limitations or conditions with reference to the inspection, or award such other or further relief as the Court may deem just and proper."

we find that allowing the Rule 30(b)(6) deposition was a sound exercise of the court's discretion.

### 2. *Palantir*

AmerisourceBergen next contends that the Court of Chancery's discovery directive conflicts with *Palantir*, seizing on, among other things, our statement in that case that "books and records actions are not supposed to be sprawling, oxymoronic lawsuits with extensive discovery."[120] We agree here with the Plaintiffs that AmerisourceBergen has exaggerated the impact of the Court of Chancery's ruling when it laments that the ruling "will send the parties on a sprawling inquiry."[121] We also agree with the Plaintiffs that *Palantir* did not establish any bright-line rules regarding discovery to be applied in all Section 220 actions. Nor did we impose a particular settle-order process in every Section 220 case. To be sure, we attempted in *Palantir* to offer guidance as to how Section 220 proceedings, which are intended to be summary in nature, should be litigated. But we said nothing—and AmerisourceBergen points to nothing—that would constrain the court in this case from exercising its discretion to permit a Rule 30(b)(6) deposition.

---

[120] *Palantir*, 203 A.3d at 754.
[121] Opening Br. at 42.

*3.     Scope of the Plaintiffs' Demand*

Finally, AmerisourceBergen claims that the Court of Chancery expanded the scope of the Plaintiffs' Demand by "facilitat[ing] Plaintiffs' request[] [of] 'Informal Board Materials' and 'Officer-Level Documents,' categories that by definition would include documents beyond the 'Board Level Materials' requested in the Demand."[122]  Once again we disagree with AmerisourceBergen's characterization of the Court of Chancery's opinion.

The court explained its classification of the Board Materials as defined in the Demand in clear terms, upon which we cannot improve:

> For each demanded category, the Demand seeks "Board Materials," which it defines as documents "that were provided at, considered at, discussed at, or prepared or disseminated, in draft or final form, in connection with, in anticipation of, or as a result of any meeting of the Company's Board or any regular or specially created committee thereof.
>
> Through this definition, the Demand requests Formal Board Materials, Informal Board Materials, and Officer-Level Materials.  The Demand seeks Formal Board Materials by requesting documents "provided at, considered at, discussed at, or … disseminated … in connection with, in anticipation of, or as a result of any meeting of the Company's Board or any regular or specially created committee thereof."  The Demand seeks Informal Board Materials by requesting "documents prepared or disseminated, in draft or final form" and because the phrases "in connection with," "in anticipation of," and "as a result of" are broad enough to extend beyond documents formally reviewed during an official meeting.  The Demand requests Officer-Level Materials because officers and other employees could have prepared documents

---

[122] *Id.* at 46.

in connection with, in anticipation of, or as a result of a board meeting.[123]

Thus, each of the three categories are derived from the definition of Board Materials set forth in the Demand. The categories are not—as AmerisourceBergen argues—"new categories of books and records [that] far exceed the categories of documents fairly requested in the Demand."[124] We therefore reject AmerisourceBergen's assertion that the court improperly expanded the scope of the Plaintiffs' Demand. Whether any Informal Board Materials or Officer-Level Materials are necessary and essential awaits the Court of Chancery's "fact specific"[125] determination, which is committed to the court's sound discretion.[126]

## IV.   CONCLUSION

We affirm the Court of Chancery's interlocutory judgment as set forth in its January 13, 2020 Memorandum Opinion and remand for further proceedings consistent with this opinion. Jurisdiction is not retained.

---

[123] *AmerisourceBergen*, 2020 WL 132752, at *25 (internal citations omitted).
[124] Opening Br. at 48.
[125] *Espinoza v. Hewlett-Packard Co.*, 32 A.3d 365, 372 (Del. 2011).
[126] *Sec. First Corp.*, 687 A.2d at 569 ("Absent any error of law, this Court reviews for abuse of discretion the decision of the trial court regarding the scope of a stockholder's inspection of books and records.").